EDITH DAVISON MILLER *v.* JOHN D. HOSPEL-HORN, Receiver.

[No. 42, January Term, 1939.]

*Decided March 8th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*James C. L. Anderson* and *David G. McIntosh, Jr.,* for the appellant.

*J. Purdon Wright,* with whom was *Alexander Armstrong* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Circuit Court No. 2 of Baltimore City, passed on the sixth day of October, in the year nineteen hundred and thirty-eight, dismissing the petition of Edith Davison Miller, the appellant. The petition was filed in proceedings pending in said court wherein the State of Maryland was plaintiff and The Baltimore Trust Company, a body corporate, was defendant, and in substance embraced the following allegations:

(a) That by a previous order of the above court, John D. Hospelhorn, receiver of The Baltimore Trust Company, had been authorized, ordered and directed to distribute the funds in his custody as such receiver, belonging and pertaining to the trust estate of the Interocean Oil Company — Oil Run Account, amounting to $28,228.37 in cash and $8512.88 in restricted funds, to the true and lawful owners of notes of said Interocean Oil Company at the rate of 3.3428 per cent in cash and at the rate of 1.0282 per cent in certificates of indebtedness of The Baltimore Trust Company.

(b) That the petitioner was the owner of notes of said oil company numbered from 10 to 22 inclusive, aggregating the sum of $66,655.51, in which sum she was entitled to participate in the distribution directed by said order, and that in compliance with the requirement of the receiver, the petitioner had duly filed with him her proof of claim; but that payment of her claim had been refused by the receiver, and the proof of the same, together with the original notes also filed with the receiver, had accordingly been returned to her.

(c) That all of said notes were dated December 1st, 1928, and were made payable, on demand, to the order of a certain Grace L. Selby; that in form they were negotiable promissory notes, title to which passed by delivery, not registered as to ownership, nor were they required to be registered by the obligor company; and

(d) Notwithstanding that said notes were made payable to the order of Grace L. Selby, they were never in fact the property of the said Grace L. Selby.

The petition then alleged that the reason the notes were made payable to a payee other than the petitioner was for the purpose of convenience, and that, on the date upon which they were received by the original payee, they were indorsed by her "and possession thereof yielded up," as would appear by an affidavit of the said Grace L. Selby, filed with the petition and prayed to be considered as part thereof; and that said notes were the property of the petitioner, purchased with money belonging to her and had been under her control since the date of issuance.

Finally, the petition prayed the court to pass an order directing the receiver of The Baltimore Trust Company to pay the petitioner the distribution alleged to be due her by virtue of her ownership of said notes, in accordance with the previous order of the court in the premises.

The proof of claim referred to in the petition, and filed as an exhibit in connection thereto, sets forth the serial number and amount of the respective notes upon which the petitioner's claim is based, and, in addition to an affidavit of ownership of the notes on the part of the claimant, is accompanied by an affidavit of Grace L. Selby, as of May 25th, 1938, which, after setting out the description of the several notes and the aggregate amount thereof, avers that the same "were immediately after being received by me, indorsed and delivered by me to the true and lawful owner, and that since said indorsement and delivery, neither directly or indirectly, have any of said notes been in my possession or under my control or ownership."

The answer of the receiver to the petition, after admitting his refusal to pay the claim as filed, avers that all of the notes set forth in the petition were not registered in the name of the petitioner, but were registered in the name of the said Grace L. Selby, who, accordingly was the registered owner of said notes, as of March 28th, 1938, the date on which the order directing the payment

of the distribution upon them was passed by the court. In support of which averment, it was stated that, according to the records of The Baltimore Trust Company, trustee under an indenture of trust securing said notes, the same were not the property of the petitioner; and that the notes secured by said indenture were not "ordinary promissory notes, negotiable with title thereto passing by delivery."

Under a stipulation appearing in the record, but one of the notes involved in this appeal is set forth therein; it being agreed that, except as to the respective amounts, all of said notes, in every respect, are similar to the one embodied in the record. And for the purpose of this opinion it may be stated that, as indicated, all of the notes were dated December 1st, 1928, and were payable on demand to the order of Grace L. Selby, upon presentation at the office of The Century Trust Company of Baltimore, with interest from date.

On the face of each note it is recited that it is one of a series of notes of like tenor but varying as to the date of issue, maturity and amount, limited in the aggregate amount outstanding at any time to the sum of $950,000, issued, or to be issued, in pursuance of, and equally and ratably secured under, the terms of an indenture dated December 1st, 1926, and successive extension agreements to which reference is made; all between Interocean Oil Company, the obligor, and The Century Trust Company of Baltimore, as trustee, copies of which indenture and extension agreements, it is recited, were open for inspection at the office of the trustee, and to which reference was made for the provisions thereof and the terms and conditions upon which said notes were issued and secured. It was thereafter set forth that the note would not be valid until after the same had been authenticated by the certificate thereon duly signed by the trustee under the indenture, which certificate was duly executed by the above named trustee.

Upon the reverse side of the notes, prior distribution payments on account of principal, and prior interest pay-

ments are credited by the trustee, and there then appears in typewritten form, the following indorsement, over the handwritten signature of the payee:

"For Value Received I hereby assign the within Collateral Note to Edith D. Miller."

"(Signed) Grace L. Selby.

"Dated.........., 19....."

The case was heard upon petition, answer and proof, the testimony in support of the petition being taken in open court. At the hearing, Grace L. Selby testified that she was secretary to C. Wilbur Miller, the husband of the petitioner, at the time the notes were purchased in her name. She identified the several notes; stated that they never in point of fact belonged to her; that they were each indorsed by her in blank at or about the date of issuance, and identified her signature as such indorser. As to the typewritten matter appearing above and below her signature, her testimony was entirely hearsay, as she was not present when the same was written. She was then asked the following question: "Q. Mrs. Selby, after you first received those notes and when you endorsed them in blank, did you ever after that have personal possession or control over them?" And her reply was "No." "Q. And that was at least ten years ago? A. Yes, sir."

As a reason for the issuance of the notes in her name, the witness gave testimony tending to show that the transaction was effected in that manner for the purpose of convenience; that Mr. Miller had other securities issued in her name, so that in his absence she would handle them, and when asked by the court how she could handle them if the notes had passed from her possession, as she had previously testified, she stated that: "They were filed in the safe in our office."

The testimony under interrogatories propounded by the court then proceeds as follows: "Q. What about The Baltimore Trust stock? Whose stock is that, that is in your name? A. It is not mine. Q. How did you get it in your name? A. That was a matter of convenience, too. Q. You mean he (referring to Mr. Miller) was the real

owner of it? A. He purchased it. I never had anything to do with it? Q. Did you know it was in your name? A. Yes, sir. Q. You acted as a straw woman? A. Yes, sir."

The witness then testified that for a number of years she had been the confidential secretary of Mr. Miller, who was formerly president of the Davison Chemical Company, and that the Baltimore Trust Company stock, referred to by the court, was acquired subsequent to the acquisition of the original notes of the oil company, which were afterwards renewed. She was then asked by the court the following questions, and gave answers as follows: "Q. Then both of them belong to Mr. Miller? A. Yes, sir. Q. You have no interest in them? A. No."

Counsel for the petitioner thereupon asked the following question: "Q. You have stated that they both belong to Mr. Miller. You don't say that those (indicating) belong to Mr. Miller?"

Whereupon the court, based upon her previous, in part hearsay, testimony, made the following observation: "she says they were kept in the safe and that some time thereafter, without her knowledge, Mr. Miller put this indorsement over her signature. * * * She just said that they were delivered to Mr. Miller and put in his safe in her control; indorsed in blank and later put in bank, and without her knowledge she learned from Mr. Miller that he had written an indorsement transferring them to his wife, in Mr. Karr's office."

The witness then proceeded to give testimony tending to show that she did not intend by her previous answer to indicate that the notes were the actual property of Mr. Miller, and explained that above five years previous to the date of the trial she was present and heard a conversation between Mr. and Mrs. Miller, the latter being the petitioner, in reference to the payment of the notes. That Mr. Miller, conceding that the notes belonged to the petitioner, then expressed a desire that, if they were paid, the latter would give the witness $5000, to the end that she might be reimbursed, to that extent, for certain

investments which the witness had made in Davison Chemical and Silica Gel securities, and that Mrs. Miller had assented to the conditional gift. In answer to the court's questions, she admitted that all interest and dividends previously collected on the notes (the last payment on which, according to the credit on the note shown in the record was January 1st, 1931), were made payable to her, and that, with one exception, she indorsed the checks and deposited them to the credit of Mrs. Miller.

On cross-examination Mrs. Selby admitted that she executed the several amendments to the original indenture agreement securing the notes, the last one of which appears from the record to have been executed December 1st, 1928; that on January 5th, 1931, she executed, with other note holders, a request that the trustee make a distribution of funds then in its custody to said note holders, and that she never advised the trustee that the notes did not belong to her. She also admitted that a large block of stock in The Baltimore Trust Company was issued in her name at the time the trust company went into receivership; that she had paid no part of the double liability, assessed against her by reason of the receivership, nor had she received any payment on account of the proposed gift from Mrs. Miller.

Later the witness was recalled, and her testimony in substance was: That in her capacity as secretary to its president, she was connected with the Davison Chemical Company; that she severed the latter relationship in 1932; that the notes were originally kept in the company's safe, to which she had access; that in November, 1932, they were removed from that safe, and that since then they had been kept a part of the time in a safe in a cellar at the home of Mr. Miller, to which she also had access; but that for several years prior to the date of the trial they had been kept in the bed room of Mr. Miller, she having delivered them to him at his request, and continuously acted as his secretary; his office then being at his private home. Explanatory of her previous testimony, the witness then gave testimony tending to show

that what she had meant to convey to the court was that she did not have access to the notes for three or four years preceding the time when notice of the distribution now payable upon them was received, and that she then was put in possession of them for the purpose of placing them in bank and collecting the current distribution. A lengthy colloquy between the chancellor and the witness then follows in the record, suffice to say, too lengthy to reproduce in this opinion. However, a careful analysis of what did follow, leads to the conclusion, regardless of assertions found in the affidavit to the proof of claim, and regardless of prior conflicting testimony of Mrs. Selby, that the notes were originally issued in her name as a straw woman; that they were immediately thereafter indorsed by her in blank; that they were kept in a safe of the Davison Chemical Company until 1932, to which she at all times had access; that she continued as the private secretary of Mr. Miller; that his scene of activity was transferred from the office of the Davison Chemical Company, in 1932, to his private home known as "Shawan"; that the notes were then placed in a safe in the cellar of the home, to which the witness also had access; that later they were taken from the safe and delivered to Mr. Miller by the witness; that they were then kept in the bed room of Mr. Miller for a period of from three to four years, beyond access of the payee witness, and that, when notice of the distribution now in controversy was received by her, they were redelivered to her with the typewritten indorsement over her signature thereon, for the purpose of depositing them in bank for collection on behalf of the petitioner.

At least it is affirmatively shown by the payee of the notes that she was a straw woman in the transaction, and that she never at any time had any financial interest in the notes.

Mr. Miller, when called as a witness on behalf of the petitioner, verified the notes as being the obligations of Interocean Oil Company of which he, at the time of their issue, was president. He then testified that they

were purchased with money belonging to his wife, entrusted to him by her for investment; that they were issued in Mrs. Selby's name, as were other stocks, so that she could transfer them, if necessary, while he was very often abroad. That Mrs. Miller usually accompanied him, and the notes were put in Mrs. Selby's name by him as agent for his wife, for like purpose.

He then explained that, just prior to the time when the instruments were sent to a bank for collection, he had conferred with Mr. Karr, an attorney who happened to be at his home, and asked him if he would figure out the amount of the distribution and attend to its collection. Mr. Karr suggested that the typewritten indorsement over the signature of Mrs. Selby be made, and that the notes be deposited in Mrs. Miller's bank at Glyndon; that, thereupon, the witness personally typed the indorsement above the Selby signature on each note, and they were sent to the Glyndon Bank for collection. The witness then testified that his wife had a private income; which she, at times, gave to him for investment; that her money was invested in the notes in controversy; that prior interest and principal payments on them were credited to Mrs. Miller's account; and that her funds and the funds belonging to him were, at times, commingled.

In answer to a query of the court as to the true ownership of approximately 15,000 shares of The Baltimore Trust Company standing in the name of Mrs. Selby, the witness admitted that it belonged to him, and stated that his ownership was well known to The Baltimore Trust Company, notwithstanding it was not issued in his name. Mr. Miller corroborated the testimony of Mrs. Selby with reference to the conversation referred to by her in which he requested, and Mrs. Miller agreed, to give $5000 to Mrs. Selby, in event the notes were fully paid; and reaffirmed that at no time did he hold any interest in the notes.

Mrs. Miller, the petitioner, testified that the notes were purchased with money belonging to her, and that they had continuously belonged to her.

Briefly, her testimony tended to show that her husband invested her funds in such securities as he deemed expedient, rather than under her direction; that the notes had been kept in his room in the "Shawan" home for about five or six years, and that she was a party to the conversation in which she gave her assent to pay Mrs. Selby the sum of $5000 upon the collection of the balance due on them. She was positive that the instruments were not accessible to Mrs. Selby, from the time they were placed in Mr. Miller's room until they were redelivered to her to be placed in the Glyndon Bank for collection, in May, 1938.

While the contrary was set out in the answer, it was not contended in the argument before this court that the notes involved were not negotiable, and in our opinion there is nothing on the face of them to affect their status as negotiable instruments.

But it was argued in this court that the typewritten memorandum appearing above the signatures of Mrs. Selby was written after the receipt of the distribution notice by her, and accordingly, after the passage of the order directing the distribution. For that reason it was submitted that the petitioner was not the *bona fide* assignee and owner of the instruments. The answer to that contention, however, is that the typewritten matter appearing over the signatures was entirely superfluous and unnecessary, if, as we conclude, and as the uncontradicted testimony tends to show, the notes were purchased with funds belonging to the petitioner, and were previously indorsed in blank by the original payee and constructively delivered to her.

The Negotiable Instruments Act, in force in this state, defines "indorsement" to mean an indorsement completed by delivery, and it also defines "delivery" to mean the actual or constructive transfer of the possession of the instrument from the indorser to the indorsee. Code, art. 13, sec. 14.

The instant case, therefore, presents a mixed question of law and fact, and, before it can be solved, we must first

determine whether the indorsements on the instruments now under consideration were accompanied by delivery, either actual or constructive.

The undisputed testimony establishes the following facts: (a) That the notes were purchased with money belonging to Mrs. Miller at the time of the purchase; (b) that they were issued in the name of Grace L. Selby and immediately thereafter indorsed by her in blank; (c) that they were then placed in the safe of the Davison Chemical Company, where private securities, purchased upon Mr. Miller's order in Mrs. Selby's name and indorsed by her in blank, were kept; (d) that the original payee was the employee of, and, in the transaction involved, the agent of Mr. Miller, and that in the same transaction the latter was the agent of his wife. Under such state of facts, it is our conclusion that there was a constructive delivery of the instruments to Mr. Miller by Mrs. Selby, and through him, as the agent of his wife, a constructive delivery was made to Mrs. Miller.

In 8 *C. J.*, p. 204, it is said: "What constitutes delivery depends largely on the intent of the parties. A constructive delivery is sufficient if made with the intention of transferring the title. It is not necessary that delivery should be by manual transfer; and this rule is recognized by the definition of delivery in the negotiable instruments law as the transfer of possession, 'actual or constructive'." "Each case, when it turns on the facts, must stand on its own facts." 7 *Am. Jur.*, page 809. The final test is, did the indorser of the notes do such acts in reference to them as evidenced an unmistakable intention to pass title to them and thereby relinquish all power and control over them?

It should be borne in mind, also, that delivery may be made to a third party for the use of the obligee. *Houlton v. Houlton,* 119 Md. 180, 86 A. 514; *Byers v. McClanahan,* 6 G. & J. 250; *Clark v. Creswell,* 112 Md. 339, 340, 76 A. 579; *Citizens' Nat. Bank v. Parsons,* 167 Md. 631, 641, 175 A. 852. And that it does not follow that Mrs. Selby's continued access to the safe in which the notes were kept,

in the office of the Davison Chemical Company, or the safe in the cellar of the Miller home in which they were kept until Mr. Miller took control of them, as indicated by the proof, was inconsistent with her original constructive delivery and transfer of them, such access to them being under the circumstances above detailed.

If, as appears from the record, and there is no evidence to the contrary therein, the notes were purchased with money belonging to the petitioner, the equitable title to them became vested in her as soon as they were issued, and her legal title in them was effected by the blank indorsement of the payee and constructive delivery which the proof also tends to show. It follows that she was the *bona fide* owner of them at the time of the passage of the order directing The Baltimore Trust Company, trustee, to make distribution upon them.

We are not unmindful of the fact that the original payee of the notes was a straw woman in a transaction involving the purchase of a large block of stock in the corporate trustee, upon which, by reason of the receivership of the trustee, there is an outstanding double stock liability, which Mr. Miller, the true owner of the stock, frankly admits was purchased by him in Mrs. Selby's name, and which liability Mrs. Selby admits has not been paid. But notwithstanding the above circumstances, in the absence of any proof on the part of the appellee tending to establish ownership of the notes by Mr. Miller or Mrs. Selby, we conclude that the instruments involved in this suit are the property of the petitioner, and it follows from that conclusion that the distribution now payable upon them should be paid to her by the trustee.

> *Order reversed and cause remanded, that an order may be passed in accordance with this opinion, the costs to be paid by the appellee.*