HERBERT J. SCANLAN and JOSEPH V. LANGKILDE, Merchants; BERNARD K. TRASK, Intervener as a party defendant; Appellants (Defendants)

v.

ALO PEPE STEFFANY of Fagasa, et al., Appellees (Plaintiffs)

No. 52-1961

High Court of American Samoa

Civil Jurisdiction, Appellate Division

December 4, 1961

585

Heard before MORROW, *Chief Justice*, and MALAUULU and TAGO, *Temporary Associate Judges*, at Fagatogo on October 2 and 3, 1961.

Bernard K. Trask, counsel *pro se* and other Appellants.

Rolland Metcalfe, counsel for Appellees.

MORROW, *Chief Justice*

This is an appeal from a money judgment rendered by the Trial Division against the appellants (hereinafter referred to as the defendants) and in favor of the appellees (hereinafter referred to as the plaintiffs). The judgment was rendered on May 2, 1961. On May 9th notice of appeal was filed, and the appeal was set down for hearing on May 31, 1961, Mr. Trask, counsel for the defendants, having

requested the Chief Justice shortly after notice of appeal was filed to have it set down for hearing within three weeks. The defendants requested two continuances which were granted, the appeal, pursuant to the second request for a continuance, being set down for hearing at 9:00 A.M. July 24, 1961.

■ About 30 minutes prior to the time the appeal was finally set down for hearing, Mr. Trask filed a motion to disqualify the Chief Justice, claiming that if he sat in the hearing of the appeal as he is required to do by Sections 167(a) and 181 of Chapter 5 (Judiciary and Judicial Procedure), § 10, Amendments, Nos. 11–59, 1952 to the Code of American Samoa, there would be a denial of due process. Mr. Trask also claimed in the motion to disqualify that the Chief Justice was biased and prejudiced against him personally. Just a few minutes after filing the motion to disqualify, Mr. Trask filed a request with the Governor that the Governor appoint a temporary Chief Justice for the reasons set out in his motion to disqualify. The Governor is authorized by Section 168 of the above Chapter 5 (Judiciary and Judicial Procedure) to appoint a temporary Chief Justice "In case of the disability, disqualification, or absence of the Chief Justice ..."

The Governor considered Mr. Trask's request and did not appoint a temporary Chief Justice.

■ The motion to disqualify came on for argument and was denied by the decision of the three-judge court. The Court considered that the above Sections 167(a) and 181 requiring the Chief Justice to sit were constitutional and that if the Chief Justice sat in the hearing of the appeal there would be no denial of due process of law. In his argument on the appeal itself, Mr. Trask claimed that Pub. Law 7–3 revising the Appellate Court system for American Samoa made the Chief Justice ineligible to sit. It does

not have such an effect since by its provisions it does not become effective prior to July 1, 1962.

Also in his argument on the motion, Mr. Trask, referring to the alleged matter of bias and prejudice, said that he might "be entirely wrong and the Court may disagree" when he (Mr. Trask) alleged that the Chief Justice was biased and prejudiced against him personally. The Court in its opinion denying the motion said that, "The Chief Justice says not only that Mr. Trask is entirely wrong but also that the Court disagrees. Any belief that Mr. Trask may entertain that the Chief Justice has bias and prejudice against him personally is a mistake on Mr. Trask's part. The Chief Justice does not entertain personal bias or prejudice against him." Mr. Trask did not file a motion to disqualify the Chief Justice when the principal case was heard in April 1961. He waited until 30 minutes before the hearing on the appeal was to begin to file his motion.

■ The motion to disqualify was filed too late. It could have been filed immediately after the notice of appeal was filed on May 9, 1961 instead of waiting until 30 minutes before the hearing on the appeal was to begin on July 24, 1961, two-and-one-half months later.

"It is a well recognized rule that an application for the disqualification of a trial judge must be filed at the earliest opportunity." 30 Am.Jur. 98.

We think the same rule should apply in this case.

The motion to disqualify was denied, and the Chief Justice sat in the hearing of this appeal as he is required by law (above Sections 167(a) and 181) to do. Both the Samoan judges on the Court and the Chief Justice considered that the latter should perform his statutory duty by sitting.

The decision in which the motion to disqualify was fully

considered has already been rendered, and there is no need to give further consideration to it in this opinion.

The plaintiffs William Steffany, Joe Steffany and their aged Samoan mother Alo Pepe are the owners of the M. V. SAMOA. They claim rent due under an alleged lease of the vessel entered into in September 1959 between the plaintiffs and the defendants Scanlan, Langkilde and Trask.

The trial court found that the lease was valid; that the defendants had taken possession of the vessel the day following the signing of the lease, kept possession under the lease until March 13, 1961 and had paid no rent. Under the terms of the lease, rent at the rate of $1,000 per month was to be paid beginning on "the first day upon which the M. V. SAMOA shall be put in actual service as a fishing vessel." The defendants were to fit the M. V. SAMOA out as a fishing vessel at their own expense. It was stipulated between the parties that the defendants put the vessel into service as a fishing vessel on March 13, 1960. The lease was to continue in force for one year after the vessel was put into such service.

The lease provided in Clause 11 "That upon the signing of this agreement by the lessors, Joseph and William Steffany, the lessee shall take immediate possession of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes."

Pursuant to Clause 11, the defendants took possession of the ship the day after the lease was signed and proceeded to refit it for fishing. The plaintiffs resumed possession of the ship 12 months after it was put into service as a fishing vessel.

The vessel was rented in the name of Herbert J. Scanlan one of the partners, the lease being signed by him for the defendant partners who were doing business under the name of "Samoan Fisheries." However, the lease itself contained no reference to Samoan Fisheries. The lease was

also signed by William Steffany and Joseph Steffany, but it was not signed by Alo Pepe, their elderly Samoan mother. She, although a co-owner of the vessel with her two sons, had always left everything in connection with it to them.

No rent having been paid, the plaintiffs instituted an action against the defendants on January 31, 1961, for $11,000, i.e. for 11 months' rent at $1,000 a month. The case came on for trial and on May 2, 1961, the Trial Division of the High Court rendered judgment for the plaintiffs for $10,000, from which judgment the defendants have appealed.

Section 213, § 10 of Amendments, Nos. 11–59, 1952 to the A. S. Code provides that:

"The findings of fact of the Trial and Probate Divisions of the High Court in cases tried by them shall not be set aside by the Appellate Division of that Court unless clearly erroneous. . . ."

The defendants resisted payment of the rent on a number of grounds, the first of which was that the lease was void under the Statute of Frauds, not being signed by Alo Pepe Steffany, one of the co-owners of the M. V. SAMOA. As indicated by the trial court in its opinion, this contention overlooks the fact that there is no Statute of Frauds in the American Samoa Code. Furthermore, the English Statute of Frauds was not brought to American Samoa as a part of the common law. With respect to the matter of the English Statute of Frauds having been brought to states in the United States as a part of the common law, the editors of American Jurisprudence say this:

"The English Statute of Frauds, 29 Car. II, is usually not considered as extending to this country, *and is of force here only by virtue of its adoption by the legislatures of the several states, directly or indirectly* (emphasis ours)." 49 Am.Jur. 364.

Since, as is clear from this statement of the law, the English Statute of Frauds was not brought to the States as

a part of the common law, it would follow that it was likewise not brought to American Samoa as a part of the common law.

However, if it should be conceded, but without agreeing, that the English Statute of Frauds did apply to the lease, it is very clear that it was complied with when Herbert Scanlan signed for the defendants. The only possible part of the English statute that could have been applicable was that part of the 4th Section which provides that:

"No action shall be brought . . . whereby . . . to charge any person . . . upon any agreement that is not to be performed within the space of one year from the making thereof . . . unless the agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, *and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized* (emphasis ours)."

The text of the English statute copied from 27 C.J. 123 n. 8 is set out in the appendix to this opinion.

The editors of Corpus Juris Secundum say that:

"The two general rules as to the party or parties who must sign the memorandum are that a party not signing the memorandum cannot be charged on the contract, *and that the only signature made necessary by the statute is that of the party to be charged, or, in other words, defendant in the action or the party against whom the contract is sought to be enforced* (emphasis ours). Mutuality of obligation is not essential to the validity of a contract, in so far as its compliance with the statute of frauds is concerned, and the fact that the contract may not be enforceable against one party, because not subscribed by him, is no defence to the other, by whom it is signed." 37 C.J.S. 698.

And the editors of Corpus Juris Secundum further say that:

"A partnership generally may sign a memorandum, so as to comply with the Statute of Frauds, by the act of one partner in signing the partnership or his *individual name* (emphasis ours)." 37 C.J.S. 703.

It is clear under the law that when partner and defendant Herbert J. Scanlan signed his name to the lease, the Statute of Frauds, had it been in force here, would have been complied with. Even if the Statute of Frauds had been applicable, it would not have been necessary, as far as the statute is concerned, to have had the signatures of any of the plaintiffs including Alo Pepe on the lease. The statute only requires that "the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and *signed by the party to be charged therewith, or some other person by him lawfully authorized;* (emphasis ours)." The statute does not require that the plaintiffs in the action sign; it is only the defendants, the parties to be charged, or their agent, who must sign. The parties charged in this case are the defendants Scanlan, Langkilde, and Trask. Scanlan signed for the defendants.

Section 1 of the Statute of Frauds provides that leases of land for years not put in writing and signed shall have the force of leases at will only. See appendix, page 640. We think it was this section that the defendants were relying upon when they contended that they were tenants at will only. However, the section has no application because a ship is not land, nor an interest therein.

The proper consideration of this appeal makes it necessary for the Court to take judicial notice of the record in an injunction case, No. 4-1960, in which the plaintiffs were the same as the plaintiffs in this case and the defendants the same, except that one Marvin Cox was a defendant in the injunction case but not this case. In the injunction case the plaintiffs (the Steffanys) filed a petition on February 21, 1960, in which they sought an order restraining the defendants "from further using the M. V. SAMOA," and also "granting possession of said vessel to

William Steffany until such time as the tentative agreement between the parties is finalized." The Steffanys claimed in their petition that the lease agreement was only a tentative agreement between the parties. The defendants claimed that the lease was valid. After the hearing on the petition had been partially completed, the plaintiffs (Steffanys) withdrew their petition and thereupon the Court entered the following order:

"Upon motion of the petitioners made in open court this 4th of March, 1960, this petition is hereby dismissed."

■ It is claimed by the defendants on appeal that both cases involved "the same parties, the same issues, and facts and question of law," and the claim is substantially correct. That we may properly take judicial notice of the record in the injunction case is clear.

"Also a court may take judicial notice of, and give effect to, its own records in another, but interrelated, proceeding, particularly where the issues and parties are the same or practically the same." 31 C.J.S. 625, citing cases from Federal courts as well as state courts.

What transpired in the injunction case was referred to (particularly by the defendants) in the trial of this case and has a definite bearing upon the correct decision on this appeal. It was an interrelated proceeding. Not only may a trial court take judicial notice of the record in an interrelated proceeding, but an appellate court may do likewise.

"An appellate court will take judicial notice of any matter of which the court of original jurisdiction may take notice." 20 Am.Jur. 55.

The trial court could take judicial notice of the record in the injunction case. The Appellate Division may also take judicial notice of that record.

Defendants Herbert J. Scanlan and Bernard Trask met with Joseph Steffany at the home of Scanlan one evening

in September 1959 for the purpose of signing the lease. Mr. Trask had carried on the negotiations with the Steffanys for the making of the lease and had drafted it for signature. William and Joseph had always handled all matters in connection with the M. V. SAMOA, their elderly Samoan mother having left everything relating to the ship to them. The lessees knew this, having been so informed by Joseph and William.

The trial court stated in its opinion that at the meeting at Scanlan's home to execute the lease Mr. Trask, who was acting as counsel for himself and his partners in the leasing of the vessel, told the assembled group that it was not necessary for Alo Pepe to sign. Defendants claim on appeal that the Court erred when it so stated. However, Joseph Steffany, who was one of the assembled group, testified on his direct examination with respect to the signing of the lease at Scanlan's house:

"Q Did you read the document before you signed it?

"A I read it but just a few sentences because my eyes—I didn't have any glasses on; my eyes.

"Q Did you have any lawyer or any other adviser about the time that you signed it?

"A Well, we—Mr. Trask, there, was supposed to be my adviser, and he was acting for both sides.

"Q Was there any remark made about the necessity or otherwise of your mother's signature?

"A Yes. It was brought up by Mr. Trask, says she didn't need to.

"Q Mr. Trask said Alo Pepe's signature was not needed?

"A Not needed because Bill and I was enough."

We cannot say that the trial court's statement that Mr. Trask told the group that it was not necessary for Alo Pepe to sign was contrary to the evidence. It finds definite support in the evidence.

On his cross-examination by Mr. Trask, Joseph testified:

594

"MR. TRASK: May it please the Court.

"Q Joe, when this exhibit, Defendants' Exhibit 1 in evidence, which you have identified to be the agreement you signed at Mr. Scanlan's house, in Clause 11 we have these words, and I quote: 'That upon the signing of this agreement by the Lessors Joseph and William Steffany, the Lessee shall take immediate possession of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes.' Do you remember that?

"A Yes, sir.

"Q Do you remember in the preliminary discussions when I asked you if your mother was a part-owner of the vessel?

"A I don't remember.

"Q Do you remember telling me what you have said in Court today, that you and your brother Bill always took care of all of the business for her, that she would leave it up to you boys?

"A Yes sir.

"Q And that is the reason why we have this Clause No. 11?

"A Yes.

"Q And you knew, did you not, Joe, that after you and Bill signed and we took possession immediately, as a matter of fact, the very next day, and started to work on her?

"A Yes.

"Q And you knew that your mother's signature was not necessary on this document?

"A Yes."

During the hearing in the principal case, Mr. Trask stated to the trial court in referring to the lease:

"It is not signed by Alo Pepe Steffany. The parties felt at the time, Your Honor, that the necessity, that there was no necessity for Alo Pepe to sign because, as the evidence brought out, both Joe and William took care of all the matters pertaining to the boat."

█ It is quite clear from the evidence and Mr. Trask's own just-quoted statement to the Court that it was intended by the parties that Alo Pepe should not sign. And it is also clear from Clause 11, drawn by Mr. Trask, which provides:

"That upon the signing of this agreement by the Lessors Joseph and William Steffany, the Lessee shall take immediate possession

of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes."

that it was not intended by the parties that Alo Pepe's signature was to be a condition precedent to the existence of a valid lease. We do not think that the evidence in the record warrants the conclusion that the defendants intended to take possession of the ship and spend several thousand dollars in refitting her for fishing without first having a valid lease; nor do we think it was the intention of the plaintiffs to turn over their ship to the defendants without a prior valid lease. Neither the circumstantial evidence nor the testimonial evidence point to any such intention by either party.

 We think that the evidence before the trial court fully warranted the conclusion that it was intended by the parties that Alo Pepe was not to sign. Furthermore, the record is devoid of any evidence that Mr. Trask, who took care of drafting the lease and getting it signed, ever made any effort to procure her signature on the lease. We conclude that the finding of the trial court that Alo Pepe's signature was not necessary to a valid lease was not error, and that this finding should not be set aside on appeal.

With respect to the actual signing of the lease, it appears that one evening in September 1959 Mr. Trask had four or five copies of it on hand at Scanlan's home to be signed. Partner Herbert J. Scanlan testified that he signed for the defendants. Joe Steffany signed. It was then nearly 10:00 o'clock in the evening. Mr. Trask took the copies already signed by Herbert and Joseph to William to get William's signature. William was on the ISABEL ROSE about ready to sail for Apia. At first he refused to sign, partly because he was "kind of afraid" to sign, as he testified, and partly because he had not read the document. He couldn't read without glasses, and he had no glasses. According to his testimony, Mr. Trask told him to sign, which he did after

596

being informed that his brother Joseph had signed.

William testified that he did not trust Mr. Trask. After he signed he told Mr. Trask in substance that the lease was "no good" without Alo Pepe's and Herbert Scanlan's signatures. We believe that William was in error when he implied that Herbert had not signed, because Herbert himself testified that he had signed at his home with Mr. Trask and Joseph present. William signed the four or five copies on the ISABEL ROSE. According to William's testimony, Mr. Trask tried to get all of the copies away from him. But William did get one copy back from Mr. Trask which he gave to his son for ultimate delivery to Wayne Storer, the Manager of the Bank of American Samoa, or to the Attorney General.

It is claimed on the appeal that the trial court committed error in referring in its opinion to the testimony of William that he did not trust Mr. Trask and that Mr. Trask had tried to keep all the copies. The trial court in its opinion did not go outside the scope of Mr. Trask's final argument, in which he said:

"During the hearing, Your Honor, there was inferences and innuendoes that perhaps I personally took advantage of the plaintiffs. One witness said 'I don't trust you.' And he had some other derogatory remarks."

Mr. Trask then proceeded to argue to the Court that he had not taken advantage of the plaintiffs.

As a matter of fact, the trial court indicated in its decision that it did not believe from the evidence that Mr. Trask permitted the lessees to take possession of the ship without the lessees first obligating themselves in writing for the rent. That would indicate that the Court considered that Mr. Trask was not taking advantage of the plaintiffs; that he was not guilty of any dishonesty. Certainly the $1,000 a month was considered to be a proper rent and if the lessees were obligated in writing to pay it, no

advantage was being taken of the plaintiffs. The trial court concurred with Mr. Trask's argument that he did not take advantage of the plaintiffs. The opinion of the trial court on this point is not a ground for reversal when the record shows the fact to be that Mr. Trask himself made an issue of his integrity in his own argument; and especially when the Court agreed with him that he had not taken advantage of the plaintiffs. Also the Court said in its opinion that, "We think that Mr. Trask was perfectly honest in his drafting of the lease. . . ."

 Furthermore, the trial court was the judge of the facts as well as the law. The Court saw the witnesses and heard them testify. It was not error for the trial court to delineate in its decision evidence surrounding William's signing.

It is next claimed that the trial court erred when it considered that William was expressing only a sailor's legal opinion when he told Mr. Trask at the time of signing that the contract was "no good" because his mother and Herbert had not signed. (As a matter of fact, Herbert had signed at his home before Mr. Trask took the lease up to the ISABEL ROSE to get William's signature.)

We think when Mr. Trask told the assembled group at Scanlan's home that it was not necessary that Alo Pepe sign (and the testimony* of Joseph Steffany above quoted shows that he did) that he was merely expressing a legal opinion, too; and that his legal opinion was based upon the fact that William and Joe had always handled everything in connection with the ship. In other words, Counsel Trask in effect, as the testimony shows, told the assembled group that the contract was good without Alo Pepe's signature; whereas William when he signed told Mr. Trask that the contract was "no good" without Alo Pepe's signature. We

---

* Supra at page 594.

think that Mr. Trask's legal opinion was correct and that William's legal opinion was wrong.

The defendants are asking the Court to construe William's statement when he signed as if he had said: "Now, Mr. Trask, I am signing this contract upon the condition precedent that it is not to be binding on me until after my mother signs."

Mr. Trask, to whom William's remark was addressed, obviously did not so construe the remark that the contract was "no good," for he and the other defendants took possession of the ship the next day pursuant to Clause 11, written by Mr. Trask, which clause expressly provided that they should take immediate possession "upon the signing of this agreement by the Lessors, Joseph and William Steffany."

It appears to us from the testimony in the record that the parties got along quite well together for about four months after the lease agreement was signed. Around early February 1960 the defendants took the ship to sea a number of times on trial runs. On one of these runs, according to the testimony of William, when the ship broke down about 11 miles out at sea, there was a call for help, and William, Captain Benson, and William Reed went out with two launches and towed it in. In response to an inquiry of William as to who was in command on these trips around early February, he answered:

"I believe his name is Cox, that skinny fellow, engineer on the Samoan Airline. . . . I guess he was lost. He was never born a seaman."

Clause 9 in the lease provided that "The Lessee shall, if possible in American Samoa, insure said vessel for a reasonable amount made payable to the Lessors." It appeared that it was not possible to secure insurance in American Samoa. However, that did not mean that it could not be procured elsewhere.

599

There was no insurance on the ship, and William began to complain to the defendants about it around January or early February 1960. This was understandable in view of the fact that the ship had to be towed in 11 miles. People familiar with the sea know that a broken-down ship near an island can easily be blown on a reef and quickly destroyed. William's complaint was not about his mother not having signed the lease, nor was it about the fact that he had said that the lease was "no good" when he had signed it about four months earlier.

During the examination of William in the principal case, Mr. Trask, referring to the difficulty over the insurance between the parties, stated to the Court:

"That is the key to the whole problem. It's the insurance that gave vent to all this difficulty. It's the seed to the disruption of our (the parties) fine relationship."

Again in his final argument to the Court, Mr. Trask said:

"The parties existed harmoniously, Your Honor, under that contract (the Sept. 1959 lease agreement) for nearly four months."

William testified that:

"The reason why I hold the ship up is no insurance, not insured."

After the question of insurance was raised by William, he and Mr. Trask met at the Bank of American Samoa where they initialed a modification in the lease, striking out of insurance clause 9 the words "if possible in American Samoa." This was about January or early February 1960 and about four months after the lease was signed. Testifying with respect to the lease at this time, William said:

"Everything was nice except that the insurance was not settled."

The trial court held that this modification was without consideration and never became effective.

From William's testimony and Mr. Trask's statements to the Court, it is apparent that the parties considered that the contract was valid. The foregoing shows that the parties did not consider that it was void because of the lack of Alo Pepe's signature or because William had said it was "no good" when he signed. The difficulty was lack of insurance.

 The parties themselves having treated the contract as valid, we cannot say, in the light of the evidence, that the finding of the Court that it was valid was contrary to the weight of the evidence. There was no error in the Court's so finding. It was the judge of the facts and the law.

The record in the prior injunction case shows that the defendants in that case did not claim that there was no contract because Alo Pepe had not signed, nor did they claim that William had signed conditionally. Instead they took the position and claimed that there was a contract.

The record in the injunction case shows that the Court in that case asked Mr. Trask, who was representing himself and the other defendants, this question:

"Now do you claim that you have a contract?"

and Mr. Trask's answer to the Court was:

"We do sir, and I am going to put it in evidence when I am ready."

Furthermore, according to the record in the injunction case, Mr. Trask in making an argument to the Court resisting a motion for a continuance said:

"Everything the bank has asked we have granted, notwithstanding the fact that we have our agreement."

Here was another statement by the defendants to the Court that they had a contract.

The following taken from the record in the principal case makes it very clear that in the injunction case the

defendants claimed and took the position that they had a contract and that they resisted the petition in the injunction case:

"CJ: Did the defendants in the injunction suit resist the petition?

"MR. TRASK: Yes, indeed, Your Honor. We were in court a whole day in argument.

"CJ: In other words, you resisted it in repudiation?

"MR. TRASK: That is right, Your Honor. Just a moment, Your Honor. We did not resist the repudiation. We resisted the petition which calls for repossession.

"CJ: In other words—

"MR. TRASK: (Interposing) We took the position that there was a contract.

"CJ: In other words, there was still a contract when you had a right to continued possession of the boat?

MR. TRASK: That is correct. That only illustrates, Your Honor, the attitude of the defendants acting in good faith. They entered into a contract four months previously with the plaintiffs, feeling and agreeing that there was a valid contract. Why? Because the plaintiffs made representations that there was no necessity for the mother to sign; that they always acted for their mother."

It is quite apparent from the foregoing, and particularly Mr. Trask's statement to the trial court that, "They (the defendants) entered into a contract four months previously, feeling and agreeing that there was a valid contract," that the defendants did not construe William's statement that the contract was "no good" as making his signing conditional. Mr. Trask told the Court in the principal case that "We (the defendants) thought we had an agreement from September to January, until January when things blew up." Obviously, the defendants did not construe William's signing as conditional. They considered that they had a valid contract.

As will appear later, Herbert J. Scanlan, the lessee, sometime after the contract was signed by William, initialed two notations inserted in it in order to correct

clerical errors contained therein. This is a circumstance leading to the conclusion that the defendants considered the contract as valid and binding on the parties. There would be no point in the defendants initialing the notations if they considered the contract to be a nullity.

■ There was no error in the trial court's conclusion that William's signing was not conditional. Its conclusion that William's statement was a mere legal opinion and not a condition finds substantial support in the record, and we cannot say that the Court's finding with respect thereto was erroneous.

■ If it should be conceded, but without agreeing, that William's signing was conditional, we agree with the trial court that he waived the condition when he raised no objection to the defendants having possession of the ship pursuant to Clause 11 and fitting her out as a fishing vessel. Upon William's return from Apia, he saw many times that the defendants were in possession of the ship over a period of months and that they were refitting her, yet during all that time he raised no objection to such possession and refitting. He acquiesced in the defendants' possession of the ship and if there had been any condition to his signing, his acquiescence would have been a waiver of it. And once having waived the condition his subsequent conduct could not reinstate it.

■ We also think that if there was a defect in the contract, but without agreeing that there was, that defect was cured by ratification by William and that the ratification would be implied by William's knowledge that the ship had been taken by the defendants and his raising no objection thereto.

The editors of Corpus Juris Secundum say this:

"A defect in the method of executing a written instrument evidencing a contract, or even want of execution, may, in general, be

cured by ratification which may be express or *implied. A party who accepts benefits accruing under a contract may be bound notwithstanding defects in, or want of, execution* (emphasis ours). 17 C.J.S. 419.

When the defendants took possession of the ship and kept possession for refitting, they accepted the very benefits specified in the writing signed by William and which Alo Pepe had not signed. That the benefits accepted may not have resulted in financial gain did not make them any the less benefits. The plaintiffs were deprived of the possession of their ship, which was a legal detriment, and the defendants gained possession and kept possession, which was a legal benefit. The defendants got what they bargained for, viz., the possession of the ship, and that was a benefit. The fact that the venture was unprofitable is irrelevant.

██ And we think also that the defendants having accepted benefits under the contract were later estopped from denying its validity. The editors of American Jurisprudence say:

"Estoppel is frequently based upon the acceptance and retention by one having knowledge or notice of the facts of benefit from a transaction, contract, instrument, regulation, or statute which he might have rejected or contested. This doctrine is obviously a branch of the rule against assuming inconsistent positions, and it has been said that such cases are referable, when no fraud, either actual or constructive is involved, to the principles of election or ratification rather than to those of equitable estoppel. The result produced, however, is clearly the same and the distinction is not usually made. Such estoppel operates to prevent the party thus benefited from questioning the validity and effectiveness of the matter or transaction in so far as it imposes a liability or restriction upon him, or, in other words, it precludes one who accepts the benefits from repudiating the accompanying or resulting obligation." 19 Am.Jur. 682–687.

Since the defendants accepted benefits under the contract when they took possession and kept possession (the

benefit specified in the September 1959 lease agreement) of the M. V. SAMOA, knowing that Alo Pepe had not signed and also that William had told Mr. Trask, when signing, that the contract was "no good", it follows that the defendants are estopped from denying its validity.

See also III, Williston on Contracts § 687 and 17 C.J.S. 926–7.

It is the conclusion of the Appellate Division that the defendants' claim in the injunction case that they had a contract was correct, and that the trial court, when it so agreed in the principal case, did not commit error. The finding of the trial court that the defendants had a valid contract is substantiated by the evidence.

The defendants claim that the trial court was in error when it said in its decision "that he (William) changed his mind about its (the lease agreement) legality by the time the lessors delivered possession of the ship to the lessees the next day," and that it was also in error when it said that "the plaintiffs acquiesced in it (the lease) without Alo Pepe's signature by delivering the ship to them (the defendants)."

We note that Mr. Trask told the trial court that:

"The parties existed harmoniously, Your Honor, under that contract (the September 1959 lease agreement) for nearly four months." (See this quotation on page 600.)

We think that Mr. Trask's statement indicates quite clearly that William acquiesced in the lease without his mother's signature. And, furthermore, we believe that Mr. Trask's statement is well supported by the evidence. And we think also, in view of his statement, that William must have changed his mind about the legality of the lease very soon after he signed it, at which time he said it was "no good" without his mother's signature. If the Court was in error as to the precise time he changed his mind this time, it was harmless.

605

At the trial William testified in part:

"Q Then in February, four months after this document (the lease agreement of September 1959) you concluded that there was no agreement because your mother did not sign?

"A Yes, I did; yes."

This indicates that William changed his mind back again in February as to the validity of the lease agreement because of the lack of his mother's signature. Other testimony of William's, as well as the fact that he signed the petition for an injunction and repossession filed Feburary 21, 1960 and sent the letter of February 16, 1960, also indicates quite clearly that he changed his mind back again in February. If the trial court was in error as to the time William had any of these vacillations of mind as to the legality of the lease agreement, it was harmless, for the defendants, having accepted benefits under the September 1959 lease agreement, were estopped to deny its validity. See quotation from 19 Am.Jur. 682–687 at page 604, supra.

Furthermore, William did not say that he had signed the lease agreement of September 1959 upon the condition that his signature was not to be binding unless and until his mother signed. He expressed the opinion that the lease was "no good" without her signature, and he concluded in February that there was no agreement because she hadn't signed. These were statements of opinion and not statements of a condition precedent. But regardless of what they were, the defendants, having accepted benefits under the lease agreement, were estopped from denying its validity. And, as we have just indicated, any error that the trial court may have made as to the time William had his vacillations of mind was harmless. Any vacillation of mind by William could not wipe out an estoppel.

■ The defendants claim that the trial court erred when it said in its opinion that:

606

"Furthermore, while it may not be necessary to a decision, we remark that since Attorney Trask, while acting as counsel and agent of the defendants, stated to the parties before anyone signed that Alo Pepe's signature was not necessary and since the lessors delivered the ship to the lessees without her signature, it follows that the defendants may well be estopped from denying the validity of the lease because of the lack of Alo Pepe's signature. Upon the evidence there was certainly an estoppel in favor of Lessor Joseph Steffany. See 19 Am.Jur. Tit. Estoppel, Sec. 24, p. 634."

We think that there was no error here, particularly in view of the testimony of Joseph quoted supra at page 594 and the law as stated in 19 Am.Jur. 682–687, quoted supra at page 604.

As before indicated, there were two notations on the lease agreement introduced in evidence by the defendants as their Exhibit No. 1, both initialed by Herbert J. Scanlan, in whose name the lease was made on behalf of the defendants. The trial court found that the notations were made to correct mere clerical errors and to make the lease read as it was originally intended to read. The trial court in its opinion said that the notations were written in by Mr. Trask, although initialed by Mr. Scanlan. Mr. Scanlan testified that while the initials were his he thought that it was Mr. Trask who wrote in the notations. On appeal the defendants claim that the Court's statement that Mr. Trask made the notations was in error and that "Though the record is a little confused the evidence is still clear enough to show that Mr. Trask did not make those notations."

It is sufficient to say that if the trial court did misinterpret the evidence and was in error as to who made the notations, the error was harmless. The legal effect of the notations depended upon their contents and the fact that Herbert J. Scanlan initialed them. Whether it was Mr. Trask or some other person who wrote them in before Mr. Scanlan initialed them had no more bearing upon their

legal effect than whether they were written with green ink or black ink or with pencil.

As we have before indicated in another connection, about four months after the defendants had taken possession of the ship and had done work in refitting her for fishing, William brought up the matter of insurance on the ship.

Clause 9 of the lease agreement, as before indicated, provided that:

"The Lessee shall, if possible in American Samoa, insure said vessel for a reasonable amount made payable to the Lessors."

William was dissatisfied with the clause, although William and Joseph had told Mr. Trask during the preliminary negotiations that it was not possible to get insurance on the ship in American Samoa. However, this did not prevent William from complaining about lack of insurance after the ship had broken down at sea. Finally William and Mr. Trask met at the Bank of American Samoa and modified the insurance clause by striking out of it the words "if possible in American Samoa" so that it then read:

"The Lessee shall insure said vessel for a reasonable amount made payable to the Lessors."

The modification was then initialed by William and by Mr. Trask as attorney.

On his cross-examination by Mr. Trask, William testified:

"Q You knew did you not, Mr. Steffany, during the preliminary discussions that insurance would be almost impossible to get for a fishing vessel?

"A Well I knew it; I guess my brother told you about it. But you said you can fix it, so you was the man to fix it.

"Q You do recall then that when the question of insurance for the vessel came up that I proposed insurance and that your brother Joseph said, 'It's impossible, you can not get insurance.' Do you

remember me then saying to your brother Joseph that 'We will put the clause in the contract anyway and I will see what I can do here in American Samoa.' Do you remember me saying that?

"A Well, I remember you said something to Joe that—but maybe you can do it; you will see that the boat will be insured.

"Q You say that you remember me saying to Joe that 'I can insure the boat?' You heard me say that?

"A Yes, because he told you you can not, but you said, 'Yes, I can get the insurance for it.'"

Counsel Trask in his brief complains that the trial court was in error when it said in its opinion that:

"However, Mr. Trask assured William that he could 'fix it,' i.e. get the insurance" and that "William . . . honestly believed since Mr. Trask had assured him . . . that insurance could be procured."

The trial court saw and heard the witness. It was the judge of the facts. It obviously believed the witness. The finding was not contrary to the evidence. It is not ground for reversal. However, the matter is immaterial anyway since the trial court found that the modification enlarged the obligation of the defendants and that there was no consideration for it so as to make it effective.

It should be stated that after the modification was made Mr. Trask did in good faith try to get insurance by writing to the agent in Western Samoa of an insurance company having an office in Sydney, Australia. However, his effort with this one company did not meet with success. It did not follow, however, that insurance could not have been procured from some other company. It is common knowledge that many companies in the world write marine insurance.

It may properly be remarked here that the fact that William initialed the modification is a circumstance clearly indicating that he recognized the lease agreement as a valid contract. There would have been no point whatever in initialing a modification in a nullity. And the fact that Mr. Trask initialed it for the defendants was a recognition by

them that it was a valid contract. There would be no point in his initialing a modification in a nullity either.

When the refitting of the ship was about completed and the defendants were about ready to take her to sea for fishing, William, knowing that no insurance had been procured, wrote a letter to the lessee Herbert Scanlan in which he said:

"As per our agreement of past, there remains two important steps to be taken before I the owner of the 'M. V. SAMOA' will allow you to take my boat out for fishing.

"These two steps are:

"1.—Our contract must be finalized by having you and my mother sign.

"2—The boat must be insured by you for a value of $25,000.00."

The letter was dated February 16, 1960.

The Bank of American Samoa was a creditor of William and Joseph for about $110,000. Its security was the ISABEL ROSE owned by the debtors. The ISABEL ROSE was not worth $110,000. If the Bank had foreclosed on the ISABEL ROSE, it could have collected any deficiency, to some extent at least, by levying on Joseph's and William's interest in the M. V. SAMOA, although the Bank did not at that time have a lien on the M. V. SAMOA.

The Attorney General was the attorney for the Bank of American Samoa. On February 21, 1960 William "representing the Steffany Family" filed the petition (heretofore referred to in another connection) for a preliminary injunction against the defendants prohibiting use of the M. V. SAMOA pending hearing on the petition and for "an indefinite injunction and restraining order prohibiting further use of the M. V. SAMOA by Samoan Fisheries until such time as the agreement for use of the vessel is settled between the parties." The plaintiff also prayed for an order "granting possession of the said vessel to William

Steffany until such time as the tentative agreement between the parties is finalized."

Also on February 21, 1960, the Bank of American Samoa filed a petition to intervene in the injunction case upon the ground that it was a creditor of the plaintiff and that "unless the interest of the plaintiff in said vessel (the M. V. SAMOA) is adequately protected, the Bank of American Samoa will be injured in that the security for the indebtedness will be diminished." The Court granted the petition to intervene.

There was a hearing in which Mr. Trask, according to the record in the injunction case, cross-examined William Steffany. However, before the hearing was fully completed, the plaintiff William Steffany, representing the Steffany Family, withdrew the petition for an injunction. The Court made an order dismissing it and the parties entered into an agreement addressed to Joseph and William Steffany which provided that:

"In consideration of your withdrawing your application for an injunction and in consideration of your permitting the M. V. SAMOA to go to sea, we, the undersigned, on behalf of Samoan Fisheries (hereinafter called the lessees), do hereby undertake that if the said M. V. SAMOA should be damaged or lost through the negligence of the lessees or their servants or from any other cause, except for damage sustained by Act of God or capture by pirates or alien enemies in time of hostilities, we shall indemnify you to the extent of Ten Thousand Dollars ($10,000.00). This undertaking is limited to a period of 31 days from the date hereof." It was dated March 4, 1960.

It is claimed by the defendants that the letter of February 16, 1960 together with the petition for an injunction constituted a repudiation of the lease agreement of September 1959 and that such claimed repudiation put an end to the lease agreement so that when the plaintiffs sued on it in January 1961 it was no longer in existence and, consequently, could not be sued on.

While it may be (it is not necessary for us to decide the point) that the letter and the institution of injunction proceeding would have justified the defendants in electing to treat the contract as repudiated and suing at once for its breach, nevertheless, that was not the course pursued by the defendants. Instead the defendants did not elect to treat the letter and the petition for an injunction as a repudiation or renunciation. They refused to accept the so-called repudiation. They rejected the claimed repudiation by resisting the petition for an injunction and retaining possession of the ship.

The hearing on the petition for an injunction began a few days after William wrote the letter to Scanlan, the letter being dated Februry 16, 1960.

It is claimed on appeal that in the decision of the trial court it erred when it said:

". . . the fact is that the defendants did not accept the repudiation. They resisted it when they resisted the petition on the hearing for an injunction."

Mr. Trask told the Court on the appeal that:

"The record discloses no resistance. The petition was withdrawn, before the plaintiffs established their allegations. There was no cross-examination or testimony. The defendants were present by virtue of process served on them."

Then Mr. Trask was asked in the hearing on the appeal:

"You say that the defendants did not cross-examine (in the injunction case) ?"

to which he replied to the Court:

"That is correct, sir."

Then counsel for the defendants then proceeded with his argument on the appeal as follows:

"At Page 9, again, the Court said "They'—meaning the defendants—'They claimed that the lease was valid. . . .'

"The fact of the matter is, no such claim was made, and the

Court cannot furnish any evidence to show that such claim was made.

"Pursuing this same notion and on Page 9, again, Your Honor, quoting the Court, we quote:

'They'—meaning the defendants—'They rejected it by resisting the petition for an injunction. . . .'

"Page 91 of the record of trial will show that the defendants did not reject the petition for injunction but merely responded to process served.

"CJ: Now you say you did not cross-examine?

"MR. TRASK: That is right, sir.

"CJ: In the injunction suit?

"MR. TRASK: That is right, sir."

We realize that more than a year and a half had elapsed between the hearing on the petition for the injunction and the hearing on the appeal, and that Mr. Trask could easily have forgotten just what transpired at the hearing in the injunction case. We think that he may very well have honestly believed that the defendants did no more in the injunction case than respond to the summons of the Court.

However, the facts are that the defendants did resist the petition and they did claim that they had a valid contract. They did more than just respond to the summons of the Court. See quotations from the record in the principal case at page 602, supra.

The record shows that Mr. Trask was asked by the Court in the principal case:

"Did the defendants in the injunction suit resist the petition?"

to which he replied:

"Yes, indeed, Your Honor. We were in Court a whole day in, argument."

The record in the injunction case shows that in that case Mr. Trask cross-examined William Steffany, the initial part of his cross-examination being as follows:

"TRASK: May it please the Court. Mr. Steffany, on Wednesday the 17th when we were with Mr. Storer, before I gave Mr. Storer

exhibit A for the plaintiff in evidence before I gave Mr. Storer this document isn't it a fact that I show another document than this?

"STEFFANY: No, Barney handed one document to Mr. Storer first and he had another then the discussion went on.

"Q Do you remember I read anything to Storer?

"A Yes.

"Q You remember me reading from a paper like this?

"A Barney read certain paper to Storer.

"Q When I read this paper to Mr. Storer wasn't Mr. Storer follow me reading at the same time?

"A No, Barney you were only reading the paper and Storer read his.

"Q I was reading aloud?

"A Yes.

"Q Before I handed this document to Mr. Storer you remember that I said I will read it and he proof read it? You remember me saying that to Mr. Storer?

"A I did not have myself clear to that picture at that time.

"Q But you remember I do read this aloud and Mr. Storer follow this document?

"A Yes.

"Q You remember me saying to Mr. Storer that this is Herbert signature, Joe's signature and your signature?

"A I did not see the document when you read it but the only thing I notice it was the document that I and my brother sign.

"Q On the last sheet I ask you if you recognize this signature?

"A Yes.

"Q Whose signature is that?

"A My brother and this is my signature, this is Herbert Scanlan."

It appears that in the cross-examiner's first question he refers to "exhibit A for the plaintiff in evidence." The foregoing taken from the record in the injunction case (of which the Court may properly take judicial notice) shows quite clearly that the defendants did more in that case than just respond to the summons of the Court. And it confirms Mr. Trask's statement to the trial court quoted on page 602, supra that the defendants resisted the petition.

The cross-examination of William by counsel for the

defendants constituted resistance to the petition. The repudiation was not accepted. On the other hand, it was rejected by the defendants when they resisted the petition in the injunction case.

We think that Mr. Trask's statement that the defendants resisted the petition in the injunction case and the foregoing quoted initial cross-examination taken from the record in that case show that the trial court did not err when it said in its decision that:

". . . the fact is that the defendants did not accept the repudiation. They resisted it when they resisted the petition on the hearing for an injunction."

The following part of the record in the injunction case shows that the Court made an inquiry of Mr. Trask as to the defendants' claim concerning the contract between the parties, and the record gives Mr. Trask's answer:

"CJ: Now do you claim that you have a contract?

"MR. TRASK: We do, sir, and I am going to put it in evidence when I am ready."

This part of the record in the injunction case indicates that the trial court did not err when it said in its decision that "They (the defendants) claimed that the lease was valid."

And we are confirmed in this view by Mr. Trask's statement to the Court in the principal case concerning the position taken by the defendants in the injunction case when he said to the Court:

"We (the defendants) took the position that there was a contract."

See page 602, supra.

The defendants on the appeal claim that the trial court erred when it said in its decision that the ship was delivered to the defendant lessees. The defendants took possession pursuant to Clause 11 of the lease agreement and claim that there was no delivery.

Clause 11 provided:

615

"That upon the signing of this agreement by the Lessors, Joseph and William Steffany, the Lessee shall take immediate possession of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes."

We think that when the defendants took possession of the ship pursuant to Clause 11 there was a delivery.

After William signed the lease, he went to Apia on the ISABEL ROSE. The next morning the defendants took possession of the ship and began refitting her.

A manual transfer is not necessary to effect a delivery. Delivery of a thing normally means a transfer of possession of the thing.

"Delivery does not necessarily import an actual physical transition of possession from one hand to another; and in its legal sense . . . it may mean a transfer of possession. There may be delivery without handling the property or changing its position." 18 C.J. 478. And "What constitutes delivery depends largely on the intent of the parties. It is not necessary that delivery should be by manual transfer. *Miller v. Hospelhorn*, 176 Md. 356, 4 A.2d 728, 733." Black's Law Dictionary (4th Ed.) p. 515.

It was not necessary in order to effect a delivery that the lessors stand on the deck of the M. V. SAMOA and manually hand the possession of the ship over to the lessees.

▆▆▆▆ It was the intention of the parties as evidenced by Clause 11, supra, that the lessee should take immediate possession of the ship upon the signing of the agreement by the lessors, and that is what happened the next morning. When the lessees took possession pursuant to Clause 11, the possession of the ship was transferred from the possession of the lessors to the lessees; the lessors no longer had possession, the lessees did, and the possession had passed from the lessors to the lessee just as it was the intention of the parties that it should, as evidenced by Clause 11.

There having been a change of possession from the lessors to the lessee, there was a delivery. We do not believe that when the lessees took possession that they committed a trespass. There was no error in the trial court's finding that there was a delivery of the ship.

The trial court did not err when it ruled that the repudiation did not put an end to the September 1959 lease agreement.

The editors of Corpus Juris Secundum say this:

"The renunciation of a contract by the promisor before the time stipulated for performance *is not effective unless such repudiation is unequivocally accepted by the promisee* (emphasis ours). If the promisee declines to accept the renunciation and continues to insist on performance of this promise, as he may do, the contract remains in existence for the benefit and at the risk of both parties, and, if anything occurs to discharge it from other causes, the promisor may take advantage of such discharge." 17 C.J.S. 978.

When the defendants resisted the petition for an injunction, they did not accept the repudiation. By resisting the petition, as Mr. Trask told the Court they did, they refused to accept the repudiation and consequently kept the contract open for both parties. And that the defendants did resist the petition in the injunction suit is very clear from the following part of the record in the principal case:

"C.J: Did the defendants in the injunction suit resist the petition?

MR. TRASK: Yes indeed, Your Honor. We were in court a whole day in argument."

And the record in the injunction case shows that Mr. Trask's statement was correct.

The defendants refused to accept the repudiation not only by resisting the petition but also by continuing to keep possession of the ship.

The withdrawal of the petition for an injunction at the close of the not-fully-completed hearing was a withdrawal

617

of the repudiation. When the petition was withdrawn, the parties entered into the agreement already set out at page 611 of this opinion.

It is claimed by the defendants that this March 4, 1961, agreement was the only one in force after the injunction suit was dismissed upon the withdrawal by William of his petition and that it constituted a lease of the ship for 31 days from March 4, 1960. The trial court held that the refusal of the defendants to accept the repudiation of the September 1959 agreement coupled with a withdrawal of the repudiation by William (and he withdrew his repudiation by withdrawing his petition for an injunction) left the September 1959 lease agreement still in force; that the new agreement was a supplementary contract and not a lease for 31 days, but only a contract to indemnify the plaintiffs against damage to or loss of their ship under the conditions set out in the agreement. In other words, the Court ruled that the new agreement was not a lease for 31 days with an indemnification agreement included in it, but only an indemnification agreement. These rulings are assigned as error.

With respect to the contention that the repudiation put an end to the September 1959 lease agreement, we have already pointed out that the repudiation did not have that effect since the repudiation was not accepted by the defendants. See quotation from 17 C.J.S. 978, supra, at page 617. On the other hand, the repudiation was rejected by them when they resisted the petition for an injunction and kept possession of the ship; not only that, but the repudiation was withdrawn, as it could be, when the petition for an injunction was withdrawn.

When the petition was withdrawn, it became the duty of the defendants to go ahead and perform their obligations under the lease agreement.

"A withdrawal of a repudiation obligates the other party to perform." 12 Am.Jur. 976.

"In case the renunciation of the contract is not accepted, the renunciation may be withdrawn and the party renouncing after performance on his part may hold the adverse party to performance." 17 C.J.S. 979.

 The supplementary agreement (set out on page 611, supra) does not purport to be a lease. During Mr. Trask's final argument in the principal case, the Court inquired about how much rent was reserved in the supplementary agreement. Mr. Trask replied:

"Nothing is said about rent, sir, nothing at all. There are no terms at all. The only thing that is in there is that they would withdraw the suit, permit us to go to sea, and we would indemnify the plaintffs $10,000 in case of damage and loss."

We agree with this statement of counsel.

The supplementary agreement contained no provision that the defendants should have possession of the ship for 31 days or for any other period. It was the undertaking to indemnify in case of loss or damage that was limited to 31 days. Mr. Trask was obviously correct when he told the Court in his final argument that "The only thing that is in there (the March 4 agreement) is that they would withdraw the suit, permit us to go to sea, and we would indemnify the plaintiffs $10,000 in case of damage and loss." The supplementary agreement did not contain a lease nor did it contain a clause rescinding the September 1959 lease agreement. It makes no mention of that agreement. The defendants came into possession of the ship about five months before by virtue of the September 1959 agreement and not by the March 4, 1960 agreement. The latter did not provide for the payment of rent.

Since the repudiation of the September 1959 lease agreement was not accepted by the defendants and since the repudiation was withdrawn when the plaintiffs with-

drew their petition for an injunction; also since the new or indemnification agreement was not operative as a lease for 31 days or any other period and did not contain a clause rescinding the September 1959 lease agreement, it follows that that agreement continued in force. See excerpt from 17 C.J.S. 978 quoted at page 617, supra.

The new agreement made sense only when read in connection with and supplementary to the September 1959 lease agreement. And we are satisfied not only that the September 1959 lease was continued in force as a legal result of the rejection of the repudiation by the defendants and its withdrawal by the plaintiffs but, also, that the parties themselves considered that the September 1959 lease agreement continued in force after the new agreement was made at the conclusion of the injunction suit.

The ship, as was stipulated, was put into actual service as a fishing vessel on March 13, 1960.

The defendants had taken the ship to sea on four or five trial runs before that time. Sometime between March 13, 1960, and April 1, 1960, when Herbert Scanlan returned to American Samoa from New Zealand, the defendants took the ship to sea again for three days and caught some fish. However, they never caught enough fish on any of the five or six runs to make a profit.

Shortly after Herbert came back from New Zealand, he and Joe Langkilde went to see William at the Marine Railway across Pago Pago Bay. They told him that they had no further use for the ship and that they couldn't run it. They asked William to take the ship back, but he told them that he would have to see Joseph and his lawyer about it. About August 1960 Trask, Langkilde and Scanlan went to Western Samoa to see Joseph; but when they proposed to him that the ship be taken back, he said that he wanted to see his lawyer and would leave the matter up to his lawyer.

Joseph apparently left the matter up to his lawyer because Attorney Metcalfe on August 11, 1960 wrote to William in Pago Pago as follows:

"Joe has informed me that two men, evidently Joe Langkilde and Herbert Scanlan, asked you to take back M. V. SAMOA and you advised them that you must consult your lawyer.

"I am glad you told them that because under the agreement which they signed the term of the lease is 12 months and there is no right to cancel it.

"They cannot compel you to take the ship back until the 12 months have expired unless it suits you to do so.

"I expect to be in Pago Pago on Monday the 15th and I shall try to telephone you or see you about what I think is the best thing to do."

The plaintiffs did not take back the ship. The defendants kept possession of it for 12 months after March 13, 1960, when it was first put into service as a fishing vessel. At the expiration of the 12 months the plaintiffs resumed possession.

Around the time of the conversation between William, Joe Langkilde, and Herbert at the Marine Railway, the defendants tied the ship up to a buoy in Pago Pago Bay. While it was tied up and continued in their possession, the defendants had it inspected two or three times a week to see that it remained in good condition.

The defendants obviously attempted to surrender the ship to William at the Marine Railway and again to Joseph at Lotopa in Western Samoa about August 1960.

The fact that the defendants went to Lotopa in August 1960, about four months after the supplementary agreement had expired, and proposed to Joseph that the plaintiffs take the ship back is circumstantial evidence indicating that the defendants considered that the September 1959 lease agreement was still in force and that they wanted to get rid of the obligation to pay $1,000 a month

621

rent. That is the only reasonable construction of their conduct. And the fact that Joseph did not take the ship back is a circumstance indicating that he considered the September 1959 lease agreement still in force.

The fishing venture had been a financial failure. The evidence is not that the defendants said to Joseph in August 1960: "Our contract came to an end 31 days after the agreement was signed by us on March 4, 1960. Here's your boat." They merely proposed to Joe that he take back the ship, but he said he'd see his lawyer and leave it up to him. The evidence is not that Langkilde and Scanlan (when they went to the Marine Railway shortly after Scanlan returned from New Zealand on April 1, 1960 and asked William to take the ship back) said to William: "Here's your boat. Our contract comes (or came) to an end on April 4." They merely asked William to take the ship back, but William said he'd have to see Joe.

 Circumstantial evidence is frequently entitled to more weight than testimonial or direct evidence. It has been said that witnesses may be mistaken or corrupted but that circumstances "cannot lie."

The editors of American Jurisprudence say this:

"The law does not require that every fact and circumstance going to make up a case be proved by eye witnesses or positive direct testimony. In both criminal and civil cases, issues may, generally speaking, be established by, and verdicts founded upon circumstantial evidence—that is by way of inference from circumstances." 20 Am.Jur. 1041.

We think that the circumstantial evidence supported the trial court's (it was the judge of the facts) conclusions that the defendants' proposals to Joe and William were made with a view of getting out of the payment of rent and in recognition of the September 1959 lease agreement, and that statements in the trial court's decision to that effect

did not constitute error as claimed. The statements were supported by the evidence.

■ The Court's conclusion on this matter constitutes the only reasonable construction that can be put on the defendants' conduct in trying to get William and Joseph to take the ship back. The circumstances did not indicate that the defendants wanted to pay $1,000 a month rent for the ship when they couldn't catch enough fish to make the venture profitable.

"In order that the attempted surrender shall release the tenant from the further payment of rent, it must be *accepted* (emphasis ours) by the landlord unless it was made in compliance with a demand by the landlord." 52 C.J.S. 270.

Since the plaintiffs did not accept the attemped surrender, the defendants remained liable for the payment of the rent.

If a man rents an apartment for a year he cannot discharge his duty to pay the rent by going to his landlord and telling him that he wants to surrender the apartment. The surrender must be accepted to effect a discharge.

■ Defendants claim on appeal that the plaintiffs were judicially estopped from pleading the September 1959 contract as the basis of their claim in the principal case, they having denied its validity in their petition for an injunction.

There is a rule against a party's taking inconsistent positions in judicial procedings.

"The rule against inconsistent positions applies generally to positions assumed not only in the course of the same action or proceeding, but also in proceedings supplemental thereto, including proceedings for review or retrial, or even in separate actions or proceedings involving the same parties and questions." 19 Am.Jur. 706–8.

However, there are a number of limitations upon this rule, and it has been laid down that in order that it may apply, it is necessary that the prior inconsistent position have been successfully maintained. 19 Am.Jur. 709. The editors of Corpus Juris state the limitation this way:

"Applying the rule, a party to an action is estopped from assuming a position which is inconsistent with his assertion of a title or contract in a previous action, which assertion was successfully maintained, *but it is essential that such assertion should have been successfully maintained* (emphasis ours)." 21 C.J. 1231–2.

 Where the suit is dismissed voluntarily, the party dismissing is not estopped from taking an inconsistent position in a subsequent proceeding. *Sinclair Refining Company v. Jenkins Petroleum Process Co.*, C.C.A., Me., 99 F.2d 9, certiorari denied *Jenkins Petroleum Process Co. v. Sinclair Refining Co.*, 305 U.S. 659, rehearing denied 306 U.S. 667, second rehearing denied 307 U.S. 651.

The rule of judicial estoppel has no application to the plaintiffs in the principal case. They voluntarily withdrew their petition for an injunction and an order for repossession of their ship. They did not successfully maintain their action in the injunction case. They did not get possession of the ship. The defendants kept possession of it and went out fishing.

On the other hand, the defendants in the injunction case took the position that they had a valid contract in the September 1959 lease agreement.

In that case, as before indicated at page 601, supra the Court asked Mr. Trask: "Now do you claim that you have a contract?" to which query he answered: "We do, sir, and I am going to put it in evidence when I am ready."

And again during the hearing in the principal case Mr. Trask (referring to the position taken by the defendants in the injunction case) stated to the Court: "We took the position that there was a contract." See page 602, supra.

624

Then the Court asked Mr. Trask: "In other words, there was still a contract when you had a right to the continued possession of the boat?" to which query Mr. Trask replied: "That is correct. That only illustrates, Your Honor, the attitude of the defendants acting in good faith." See page 602, supra.

As before indicated, Mr. Trask also during his final argument in the principal case to the query by the Court: "Did the defendants in the injunction suit resist the petition?" replied: "Yes, indeed, Your Honor. We were in court a whole day in argument." See page 602, supra.

Our examination of the record in the injunction case convinces us that Mr. Trask was entirely correct in his foregoing statements to the trial court.

The defendants having resisted the petition in the injunction case and having taken the position that the September 1959 lease agreement was a good contract and having prevailed in that case cannot now say that that contract was a nullity. And the defendants did prevail, when, after having resisted the plaintiffs' petition, the plaintiffs withdrew it and the Court dismissed it, and the defendants kept possession of the M. V. SAMOA and took it out to sea to catch fish.

It follows, therefore, having taken the position in the injunction case, that the September 1959 lease agreement was a valid contract; and having successfully maintained that position, the defendants are now judicially estopped from taking an inconsistent position in the principal case by asserting that the very same contract they said was good in the injunction case is void in the principal case. See the quotations from 19 Am.Jur. 706–8 and 21 C.J. 1231–2 at pages 623, 624, supra.

Not only did the defendants take the position in the injunction case that they had a contract, but Mr. Trask stated to the Court in the principal case that it was

625

"correct" that they "had a right to continued possession of the boat" under that contract. See page 602, supra. Our conclusions on the evidence with respect to the attempted surrenders at the Marine Railway and Lotopa are in accord.

The defendants claim that the trial court erred when it said in its decision that "The Court did not issue a preliminary injunction or restraining order." The record in the injunction case does not show that any injunction was issued. However, Mr. Trask states on appeal that "The Court orally ordered Mr. Trask not to remove the ship pending hearing." While the Chief Justice has no definite recollection of such an oral order, it may very well be that Mr. Trask's recollection is entirely correct. Assuming it is (and we do not question it), it would not be ground for reversal in this case—the oral order being merely an interlocutory one maintaining the status quo pending hearing and not going to the merits. It did not prevent the defendants from maintaining their position successfully. The plaintiffs' petition was dismissed.

On appeal the defendants claim that William testified at one time that he typed letter of February 16, 1960 (set out supra)* and that he later testified that he did not type it, it being typed by Marcel; that such alleged contradictory testimony constituted perjury by William, and, as a consequence of the alleged perjury, the defendants were deprived of due process of law.

We do not believe that this claim of perjury has any basis either in fact or law. In the first place, the alleged testimony did not relate to a matter material to the issues. The substance of the letter sent by William to Herbert was to the effect that William would not allow Herbert to take

---

* At page 610.

the boat to sea for fishing until (1) the contract should be "finalized by having you and my mother sign," and (2) "The boat must be insured by you for a value of $25,000."

Perjured testimony must relate to a material matter.

"At common law and under statutes preserving the common law rule in this respect, a false statement must be material to the issue or question under consideration in order to constitute perjury, and a false oath as to superfluous and immaterial matter will not sustain an indictment for this offense." 70 C.J.S. 465.

Section 864 of the A. S. Code relating to perjury provides that:

"Every person, who, having taken an oath before a competent tribunal . . . that he will . . . testify truly . . . shall willfully and contrary to such oath state . . . any *material* (emphasis ours) matter which he does not believe to be true, is guilty of perjury. . . ."

Our statute requires that the matter testified about be material.

This letter by clear inference denied that the lease agreement was a valid document, and it also put the procurement of insurance in the sum of $25,000 as a condition for taking the boat to sea, which was not a condition in the lease agreement. What was material in connection with the letter was its contents, the fact that William signed it so as to make the contents his, and that he sent it to Herbert. Its legal effect was not determined by who struck the keys on the typewriter used in typing it. The legal effect was the same whether it was typed by William, by Marcel, or by John Doe. It constituted a substantial but not complete repudiation of the September 1959 lease agreement, and it did so whether William, Marcel, or John Doe typed it. Who typed it was immaterial.

On the first day of the hearing, on cross-examination by Mr. Trask, William testified as follows:

"Q Now I show you a document marked Defendants' Exhibit No. 4 and ask you if you recognize the signature here?

"A Yes.

"Q Whose signature is this?

"A It's mine.

"Q And it is a letter dated February the 16th, 1960 and addressed to Mr. H. Scanlan?

"A Well, I believe, because I wrote the letter. But the date . . .

"Q Well here is the date; is that correct, you put that date there?

"A Yes, but I remember I wrote the letter.

"Q You typed this letter out? Do you remember what you said in the letter?

"A Yes, that I cannot take the ship out unless they pay $25,000 worth of insurance."

On the second day of the hearing on recross-examination of William by Mr. Trask the record shows the following:

"MR. TRASK: May it please the Court.

"Q Mr. Steffany, going back to Defendants' Exhibit No. 4 in evidence wherein you stated on the redirect examination that this letter was not typed by you but by Marcel, why did you volunteer the information yesterday when I showed you this exhibit and you said, 'I typed it' without being asked? Why did you say that?

"A I can prove to you I don't know enough to type my name on the typewriter.

"Q Answer the question: why did you say yesterday under oath without anyone asking you, why did you volunteer the information that 'I typed this. My name is in there, I signed it'? Why did you say you typed it? Just why did you say to the Court that you typed it; that is all.

"A I don't know how to type that, Barney.

"Q Just answer the question: why did you say to the Court you typed it?

"A Well, I signed my name there.

"Q Is this a joke? Are you laughing about it?

"A I don't know how to type.

628

"MR. METCALFE: Are we getting anywhere with all this shouting? The witness has said he can't type; it's quite evident that he is confused.

"MR. TRASK: Your Honor ...

"CJ: (Interposing) I think the Court knows the truth.

"MR. TRASK: We are not going to be permitted, Your Honor, to show for the record that obviously there has been perjury committed in this Court?

"MR. METCALFE: I object to that.

"MR. TRASK: Your Honor, he testified under oath. It's not a matter for argument, sir. It's a matter of record. It's the question of the integrity and honesty of this Court, sir.

"CJ: Well the Court will consider the evidence.

"MR. TRASK: We certainly have a right to put it in the record, sir.

"THE WITNESS: Why didn't you ask me if I didn't know how to type?

"MR TRASK: The question is a valid question. It involves not only the integrity of the witness, sir, it involves the whole judicial system. The counsel objects to the fact that we are not getting anywhere by this type of action, sir.

"CJ: That is right.

"MR. TRASK: But I am trying to bring out that this witness has voluntarily said to the Court yesterday under oath that he typed the instrument. Today he says that somebody else did.

"CJ: Well, now, did he say that yesterday? Well, Mr. Trask says that you said yesterday that you typed that letter, and he wants to know why you said that. Now will you please tell him?

"THE WITNESS: Well, why I saw my name there—well, that is the meaning of the whole thing. I typed it or somebody else typed it. My name is there, so I say yes.

"MR. TRASK: Q You mean then, Mr. Steffany, it makes no difference whether Marcel typed it, that this is still your statement, it is still yours?

"A That is my understanding, and I signed it.

"Q And everything that is contained in here is from you, it's yours?

"A Well, yes."

629

The above quoted testimony on the first day of the hearing shows that William testified that he "wrote" the letter. He did not say in that testimony that he "typed the letter." The last question in the quoted testimony on the first day is:

"Q You typed this letter out? Do you remember what you said in the letter?

"A Yes, that I cannot take the ship out unless they pay $25,000 worth of insurance."

 The question was an improper one. "Questions containing more than one proposition to which different answers might be given are improper." 98 C.J.S. 33. The witness did not answer the first question about whether he typed the letter. He did answer the second question about what he said in the letter.

The quotation from the record shows that Mr. Trask asked William on recross-examination on the day following his testimony if he (William) wrote the letter:

"MR. TRASK: Answer the question: why did you say yesterday under oath without anyone asking you, why did you volunteer the information that 'I typed this. My name is in there. I signed it'? Why did you say you typed it? Just why did you say to the Court that you typed it; that is all."

"A I don't know how to type that, Barney."

This question was misleading to the witness. William had said that he "wrote" the letter, not that he had "typed" it. The question was misleading to the witness because it assumed a fact not in evidence. William had testified that he "wrote" the letter. He had not testified that he "typed" it. It is improper for a cross-examiner in asking a question to include in it facts not supported by the evidence. McBaine, California Evidence Manual (2d ed.) 114.

And it is entirely possible that the cross-examiner misled not only opposing counsel but also the Court by stating to

the witness that he had testified the day before that he had "typed" the letter. We believe from the record that the witness told the truth when he answered the question by saying: "I don't know how to type that, Barney."

We have no doubt after reading the testimony that the fact is that William got Marcel to type the letter after telling him the situation about the boat, that William then signed it and sent it to Herbert; and that that being true, William wrote the letter; he did not type it. When William signed the letter he made its contents his.

Among the meanings for the word "write" given in Webster's New International Dictionary (2d ed.) is: "To compose, send, or communicate by, a letter or letters." To send a letter is to "write" it. When William sent the letter to Herbert, he "wrote" it. If A dictates a letter addressed to B to his stenographer, who types it, and A signs it and sends it to B, A has written a letter to B; and if A meets B on the street a couple of days later and says to B, "I wrote you a letter a couple of days ago," he is stating the truth. There was no perjury here. The matter inquired about was not material. There was no denial of due process here.

Mr. Trask claims that the Court viewed his efforts to show perjury by William as a joke. Apparently it was William, if anybody, who viewed the effort as a joke, and not the Court, for Mr. Trask asked William:

"Q Is this a joke? Are you laughing about it?
"A I don't know how to type."

Apparently counsel on appeal is asserting that the Court prevented him from showing perjury. The record does not show that. It shows that during the cross-examination with respect to who typed the letter the Chief Justice said: "I think the Court knows the truth" and that "Well the Court will consider the evidence." And when Mr. Trask stated to

631

the Court that "The counsel (Mr. Metcalfe) objects to the fact that we are not getting anywhere by this type of action, sir," the Court replied: "That is right," thereby agreeing with Mr. Trask that Mr. Metcalfe did object.

Counsel for the defendants in his appeal brief says that "In the principal case before the Court, Judge Morrow at one stage of the hearing looked with obvious disgust and resentment at Mr. Trask when Mr. Trask endeavored to show perjury on the part of William Steffany."

We do not know from the record how Judge Morrow looked at Mr. Trask. However, Mr. Metcalfe in his reply brief says:

"It is true that after an outburst by counsel (Mr. Trask) in which he alleged that William Steffany committed perjury the Judge did look at him. Many judges would have given him more than a look."

■ Again the defendants on appeal complain that the trial court was in error when it stated in its opinion that Langkilde was in the group that met at Scanlan's house "one evening in September 1959 for the purpose of signing the lease." If this was an error, it was harmless. The presence or absence of Langkilde when the group met for the signing was immaterial as far as the validity of the lease was concerned. Herbert signed for the defendants and the presence or absence of Langkilde was of no consequence. An agent may sign a contract for his principal and bind him whether his principal is present or is on another island.

The opinion in the principal case was written by the judge using his notes with occasional assistance from the reporter's stenotype notes, the reporter reading parts of the same to the judge. When one of the defendants' motions for a continuance was being heard, the judge told counsel that in the preparation of the opinion he had used

his notes with some assistance from the reporter's notes. The defendants now claim on this appeal that the judge should have used a transcript.

Defendants claim on appeal that the method used by the judge in preparing his opinion is grounds for reversal and granting a new trial. Counsel for the defendants characterizes the judge's statement that he had prepared his opinion using his notes with some assistance from the reporter's stenotype notes as an "unbelievable confession;" that it was an admission "unprecedented and unequalled."

There is no rule of practice which forbids a judge to use his own notes in writing an opinon. The law did not require the writing of an opinion in this case. And if the judge saw fit to write an opinion, he could use any method he wanted to. The question is whether the judgment was correct; not the method the judge used in writing the opinion. Trial judges usually render their judgments without opinion. And when a trial judge does write an opinion, he may use only his notes.

In the bulk of cases, both in the High Court and Court of Appeal in England, the judges deliver their judgments orally at the close of argument, and they are taken down by an official shorthand writer. Very few judgments are reserved. See 47 American Bar Association Journal 699 (July 1961). See also 45 American Bar Association Journal 1258 (December 1959). The fact that the judge used his notes with occasional help from the reporter's notes in the preparation of his opinion was not error.

It is difficult for us to believe that counsel for the defendants thought it was error for the judge to use his notes, but he apparently did. He did not cite any authority on the point.

The defendants complain in their brief that the Court in its opinion "italicized" the words "fix it" when it said ". . .

Mr. Trask assured William that he could 'fix it,' " i.e. get the insurance. The words "fix it" were not italicized but put in quotes, William having testified with reference to this matter on cross-examination by Mr. Trask:

MR. TRASK: "You knew did you not, Mr. Steffany, during the preliminary discussions that insurance would be almost impossible to get for a fishing vessel?"

WILLIAM: "Well, I knew it; I guess my brother told you about it. But you said you can fix it, so you was the man to fix it."

There was no error here. The quotation was from the testimony, and the trial court was the judge of the facts.

Mr. Trask had drawn the September 1959 lease agreement sued on. It was signed only by Scanlan and the Steffany brothers. Mr. Trask was not a party to the contract on its face. When the contract was sued on, Mr. Trask filed a petition to intervene as a party-defendant. On the hearing on the petition, Mr. Trask informed the Court that "Scanlan is the only party liable on the face of the contract." He stated that he (Mr. Trask) had not signed it but that he had drawn it. His name did not appear in the contract. The contract did not describe anybody as doing business as the Samoan Fisheries. Mr. Trask described the fishing enterprise as a "joint venture."

The Court then asked him:

"Now I notice that you use the term joint venture. Do you mean joint venture or a partnership?"

To which query he replied:

"It was a joint venture, Your Honor; sort of a loose partnership, Your Honor."

He also told the Court that there was a second contract. The Court asked Mr. Trask:

"Is there anything in that second contract, on the face of it, that would make you personally liable for the rent?" to which he replied "no, sir."

634

Mr. Trask told the Court that the reason that only Scanlan was made liable for the rent on the face of the contract was "for the convenience" of the Steffanys. Doubtless the Court thought that it would be just as convenient for the Steffanys to accept a rent check from a partnership of which Scanlan was a member as it would be to accept a rent check from Scanlan alone.

Since the Court had to decide whether Mr. Trask was liable on the contract (and he had drawn it) when on the face of it he was not and he had described the organization as "a sort of loose partnership" (it is not certain as to what a "loose partnership" is), it was reasonable for the Court to inquire of him as to why it was so drawn, which the Court did when it asked him:

"When you drew it, you drew it in such a way that only Scanlan was liable on it and you weren't?"

That question invited an explanation as to why the contract was so drawn. It was a reasonable and proper question. But it did not bring forth any explanation. Then the Court asked him:

"Well, would you tell us then if you are liable on the contract?"

Mr. Trask then said to the Court:

"Not on the contract . . . my name does not appear in the contract."

And that was the contract sued on.

 Defendants complain of the question which obviously was intended to elicit the reason for drawing the contract as it was drawn. Mr. Trask was claiming in one breath that he was liable for the rent of the ship and should be permitted to intervene, and in the next breath he was telling the Court that he was not liable on the face of the very contract for the rent which was being sued on. Defendants claim on appeal that the judge had personal

knowledge that Mr. Trask was in partnership with the other defendants. However "a sort of loose partnership" not being accurately definable, it is difficult to see how the Court could have had personal knowledge as to whether Mr. Trask was a real partner or a loose partner, so loose as not to be liable on the contract. The question complained of was a proper one under the circumstances since an answer to it might well have cleared up confusion and enabled the Court to make a ruling. However, the Court was satisfied after Mr. Trask put Mr. Metcalfe on the witness stand and established that Mr. Trask was a partner, and it granted him leave to intervene. There was no error in asking the question complained of.

The defendants' claim on appeal that the judgment was contrary to the evidence is without foundation.

The defendants themselves introduced in evidence the September 1959 lease agreement (Defendants' Exhibit No. 1); they established that they took possession of the ship the next day and kept possession, which was the benefit stipulated for the defendants in the lease agreement. Having received and accepted the benefits under the lease agreement, they were then estopped from denying its validity. See 19 Am.Jur. 682–687 quoted supra, page 604.

The defendants introduced in evidence the letter of February 16, 1960 (Defendants' Exhibit No. 4) and the petition (Defendants' Exhibit No. 5) in which the plaintiffs sought the injunction and repossession of the ship.

The letter and the petition constituted an almost complete repudiation by the plaintiffs of the September 1959 agreement.

Mr. Trask informed the Court in the principal case that in the hearing on the petition for an injunction that the defendants resisted the petition and took the position that there was a contract, which the record in the proceedings

on the petition fully establishes. See Mr. Trask's statements to that effect to the Court quoted on page 602, supra.

The resistance to the petition constituted a refusal to accept the plaintiffs' repudiation and kept the contract open for both parties. 17 C.J.S. 978 quoted supra, page 617. Then the defendants introduced in evidence the supplementary contract (Defendants' Exhibit No. 6) which established the fact that the plaintiffs withdrew their petition, thereby withdrawing their repudiation. The defendants, in addition, proved by Herbert Scanlan's testimony that they went to Apia in August 1960 and tried to get Joseph to take the boat back and that he put them off, saying he'd have to see his lawyer about it. Also, the defendants themselves proved by testimony of Herbert that they proposed to William shortly after April 1, 1960 at the Marine Railway that he take the boat back and that he put them off by saying he'd have to see his lawyer and Joseph about it.

By stipulation in open court the defendants agreed that the boat was put into actual service as a fishing vessel on March 13, 1960. The defendants introduced evidence to the effect that they had possession of the boat for a year after March 13, 1960 proving that they had it inspected two or three times a week to see that it remained in good condition. The rent of $1,000 a month was to begin when the ship was put into actual service as a fishing vessel.

Having established that they prevailed in the injunction proceeding and kept possession of the boat and in view of Mr. Trask's statement to the Court that they resisted the petition in the injunction case and claimed there was a contract (sustained also by the record in the injunction case), the defendants themselves established that they were estopped from taking an inconsistent position in the principal case to the effect that the September 1959 lease

637

agreement was not a valid, subsisting document. See quotations from 19 Am.Jur. 706–8 and 21 C.J. 1231–2 on pages 623, 624, supra.

And the defendants themselves established that there was no estoppel against the plaintiffs with respect to inconsistent positions when they proved by Defendants' Exhibit No. 6 (the supplementary contract) that the plaintiffs had withdrawn their petition for an injunction and repossession, thereby showing that the plaintiffs had not successfully maintained their position in the injunction case. See quotation from 21 C.J. 1231–2 at page 624, supra.

Not only did the plaintiffs prove their own case but the defendants proved almost all of it a second time for them. The defendants did not prove that they had not paid any of the rent called for by the contract. That was proved by the testimony of William, and it was not denied by the defendants.

In view of the fact that the plaintiffs proved their own case and the defendants, in addition, proved almost all of it a second time for them, our conclusion is that the claims on appeal that the conclusion, order, and judgment of the Court was contrary to weight of the evidence and the preponderance of the evidence and contrary to the authorities are not well grounded. It is our conclusion from the record that the defendants had a full and complete hearing and that they were accorded due process of law.

The editors of Corpus Juris Secundum say:

"Error in declarations or rulings of law given by the court will not constitute a ground for reversal where it sufficiently appears that no prejudice resulted from the erroneous declaration or ruling, as where the error is merely one of form; where the same judgment would follow whether the law on the issue involved was declared correctly or incorrectly; where, notwithstanding such erroneous declarations, it is apparent from the record that the case was tried on the right theory, or that the judgment is obviously correct; or

where the particulars in which the declaration was erroneous were obviated by the appellant's admissions, or the findings of the court or jury." 5B Corpus Juris Secundum 18.

It is apparent from the record that the case was tried on the right theory and that the judgment of the trial court was correct, particularly in view of the admissions of the defendants by their counsel as shown in the quotations from the record set out at page 602, supra, and evidence introduced by the defendants themselves.

Mr. Trask sent copies of his appeal brief to the Secretary of the Interior and the Attorney General of the United States. Referring to this fact, Mr. Metcalfe, counsel for the plaintiffs, said in his argument:

"I cannot escape the suspicion that this is an attempt to bring political influence to bear on this Court. The day when political influence makes itself felt in this Court will be an unhappy one for Samoa, and any man who tries to subject this Court to political influence is a traitor to the cause of justice and a traitor to the people of Samoa."

Referring to this same matter, Mr. Trask said in his final argument:

"My political activity in this community is known and is common knowledge, but no one within the hearing of my voice can say at anytime that I have used political influence against this Court. And anyone who makes such charges is out of his mind. It is embryonic and infantile!"

Mr. Trask, however, did not explain why he sent copies of the brief to the Secretary of the Interior and the Attorney General of the United States.

The Court expresses no opinion as to why the copies were sent to the two Cabinet officers.

Suffice it to say that no political pressure whatsoever has been brought to bear upon this Court to get a decision

one way or the other on this appeal. The Secretary of the Interior and the Attorney General of the United States are men of high intelligence and great ability; they are men of integrity, honorable and upright. Neither of them would even think of bringing political pressure upon a court to secure a decision one way or the other in any case.

The judgment in this case should be affirmed.

### ORDER OF AFFIRMANCE

It is hereby ORDERED that the judgment entered by the Trial Division in the case of Alo Pepe Steffany of Fagasa, Widow, William Steffany of Pago Pago, Master Mariner, and Joseph Steffany of Lotopa in Western Samoa, Retired Master Mariner, Plaintiffs v. Herbert J. Scanlan and Joseph V. Langkilde, both of Fagatogo, Merchants, Defendants, Bernard K. Trask, Intervener, As a Party Defendant, No. 25-1961, be and the same is hereby affirmed.

Court costs in the Appellate Division on this appeal aggregate $50.00 of which $16.67 are hereby assessed against Bernard K. Trask and a like sum against Herbert J. Scanlan. The assessed costs are to be paid within 30 days.

---

### APPENDIX

*Statute of Frauds as set out in Note 8 of 27*
*Corpus Juris at Page 123*

"Text of statute—'Section 1. All leases, estates, interests of free-hold or terms of years, or any uncertain interest of, in, to, or out of any messuages, manors, lands, tenements, or hereditaments, made or created by livery and seizin only or by parol, and not put in writing and signed by the parties so making or creating the same, or their agents thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or

greater force or effect; any consideration for making any such parol lease or estates, or any former law or usage, to the contrary notwithstanding. Section 2. Except, nevertheless, all leases not exceeding the term of three years from the making thereof, whereupon the rent reserved to the landlord during such term shall amount unto two-third parts at the least of the full improved value of the thing demised. Section 3. And, moreover, that no leases, estates, or interests, either of freehold or terms of years, or any uncertain interest, not being copyhold or customary interest of, in, to, or out of any messuages, manors, lands, tenements, or hereditaments, shall be assigned, granted, or surrendered, unless it be by deed or note in writing signed by the party so assigning, granting, or surrendering the same, or their agents thereunto lawfully authorized by writing, or by act and operation of law. Section 4. No action shall be brought whereby to charge any executor or administrator upon any special promise, to answer damages out of his own estate; (2) or whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriages of another person; (3) or to charge any person upon any agreement made upon consideration of marriage; (4) or upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them; (5) or upon any agreement that is not to be performed within the space of one year from the making thereof; (6) unless the agreement upon which such action shall be brought; or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized. Section 17. No contract for the sale of goods, wares, or merchandise for the price of £10 sterling, or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part of payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized.' "